**FILED**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DEC 1 9 2006

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

---

CINDY SHEEHAN,

           **Appellant,**

   v.

UNITED STATES OF AMERICA,

           **Appellee.**

---

MAX OBUSZEWSKI,
LYNN MAXINE ROBINSON,
PERRY REEVE,
DON G. MULLER,
EVAN G. LONG,

           **Appellants,**

   v.

UNITED STATES OF AMERICA,

           **Appellee.**

06-MJ-0006 (JMF/TFH)

---

## MEMORANDUM OPINION

Following separate bench trials that took place November 16-17, 2005, and December 21, 2005, respectively, appellants Cindy Sheehan, Max Obuszewski, Lynn Maxine Robinson, Perry Reeve, Don G. Muller, and Evan G. Long were convicted of demonstrating without a permit in violation of 36 C.F.R. § 7.96(g)(2), which is a National Park Service regulation.[1] The appellants

---

[1]    Cindy Sheehan was tried November 16-17, 2005, before United States Magistrate Judge Alan Kay. Max Obuszewski, Lynn Maxine Robinson, Perry Reeve, Don G.

challenge their convictions on the grounds that (1) the National Park Service regulation is

unconstitutional because it imposes strict liability on the exercise of protected First Amendment

conduct, (2) the evidence was insufficient to prove that the appellants were "demonstrating"

within the meaning of the regulation, and (3) the evidence was insufficient to prove that the

appellants demonstrated without a permit.[2]  After carefully considering the arguments raised by

the parties in their legal briefs and during the hearings held on August 28, 2006, and September

15, 2006, the Court affirms the judgments of conviction for the reasons that follow.

## I.

During the afternoon of September 26, 2005, more than 300 people assembled on the

White House sidewalk to protest the war in Iraq and petition the government to redress their

grievances.[3]  Trial Tr. Day 1, 50-51, 61-62, 88, 120-21, 152-53, Nov. 16, 2005; Trial Tr. 81, 124,

---

Muller, and Evan G. Long were tried December 21, 2005, before United States
Magistrate Judge John M. Facciola.

[2]    Obuszewski's appellate brief repeated the same legal arguments presented by
Sheehan in her briefs. Obuszewski Br. 2-9. Robinson then incorporated by
reference Obuszewski's brief, and further challenged her conviction on the
grounds that the "right to petition should supercede the need for a permit," "the
demands for a permit are not uniformly applied" and "prosecution for
demonstrating without a permit appears selective." Robinson Br. 2. In the same
fashion, Reeve, Muller, and Long incorporated by reference both Obuszewski's
and Robinson's briefs. Reeve Br. 1; Muller Br. 1; Long Br. 3. Thus, with the
exception of the three additional legal arguments raised by Robinson and
subsequently incorporated into Reeve's, Muller's and Long's briefs, the appellants'
legal arguments are the same and repetitive of the issues first raised by Sheehan in
her appeal. Accordingly, for convenience, the Court will cite only to Sheehan's
appellate briefs when referring to legal arguments uniformly raised by all
appellants.

[3]    The regulation defines the term "White House sidewalk" to mean "the south
sidewalk of Pennsylvania Avenue NW., between East and West Executive

-2-

156, Dec. 21, 2005. By all accounts, the participants engaged in nonviolent conduct that

included yelling, singing, chanting, carrying signs, sitting and other similar forms of expression

that drew a crowd of spectators. Trial Tr. Day 1 50-51, 62, 64, 153, 88-89, 120-21, 153, Nov. 16,

2005; Trial Tr. 81, 134, 155-56, 181, 194, Dec. 21, 2005. Although the National Park Service

issued a permit to an organization called the Iraq Pledge of Resistance to demonstrate at the

Ellipse and Lafayette Park, that permit did not authorize a demonstration to take place on the

White House sidewalk.[4]  Gov't Trial Ex. 1 (Nov. 16, 2005) (Permit No. 05-1625 (Sept. 26,

---

Avenues NW."  36 C.F.R. § 7.96(g)(1)(v).

[4]    The trial evidence showed that two gentlemen named Peter Perry and Gordon
Clark submitted permit applications to the National Park Service on behalf of the
Iraq Pledge of Resistance. Gov't Trial Ex. 1 (Nov. 16, 2005). Mr. Perry's
application, which was dated July 20, 2005, requested a permit to demonstrate at
the Ellipse. *Id.* Mr. Clark's application was dated July 28, 2005, and requested a
permit to demonstrate at Lafayette Park, as well as the White House sidewalk. *Id.*
Mr. Clark later cancelled the request to demonstrate on the White House sidewalk,
however, as is abundantly clear from the e-mail he sent to John Harasek, an
official in the National Park Service's Intelligence/Counter-Terrorism Unit, and
carbon copied to Richard Merryman, Chief of the National Park Service's
Division of Park Programs, with whom he was coordinating the planned
demonstration:

> While I continue to be interested in the answers to the questions I sent
> earlier, I want to communicate that we do NOT want the permit to
> include the White House sidewalk. We would like to include the
> Ellipse and Lafayette Park, of course, as we have discussed
> previously, but to repeat, we do not want the permit to include the
> White House sidewalk. This decision will not change regardless of
> the answers to my previous questions, so please feel free to finish
> processing the permit so you can fax it to me this afternoon . . . .

*Id.* (e-mail from Clark to "Harasek, Merryman and others" of 9/23/05). The
evidence also showed that, although the Iraq Pledge of Resistance cancelled its
request to demonstrate on the White House sidewalk, the organization and its
participants nevertheless intended to commit civil disobedience there. *Id.* (Permit

-3-

2005)).

Shortly after 1:30 p.m. that day, Captain Pat Smith[5] of the United States Park Police

warned the participants that they were violating a National Park Service regulation and must

leave the White House sidewalk immediately to avoid arrest. Trial Tr. Day 1, 51, 62, 89, 121-22,

153-54, Nov. 16, 2005; Trial Tr. 85-87, 123-124, 134-35, 157, 179, 182, Dec. 21, 2005.

Lieutenant Smith's warning was amplified using a megaphone and transmitted via the

loudspeaker system on two police cars. Trial Tr. Day 1, 52, 63, 149, 154, Nov. 16, 2005; Trial

Tr. 99, 103, 157-58, Dec. 21, 2005. The warning was repeated twice, for a total of three

warnings, and several minutes lapsed between each warning to afford participants time to leave

the sidewalk.[6] Trial Tr. Day 1, 51-52, 62-63, 89-90, 154, Nov. 16, 2005; Trial Tr. 99-100, Dec.

---

No. 05-1625 (Sept. 26, 2005) (stating that "[c]ivil disobedience is also being planned on the White House sidewalk with approximately 300 individuals participating)). *See also id.* (E-mail from Clark to Merryman of 9/22/05 (stating that "[i]n terms of numbers of people who are willing [to] risk arrest in acts of nonviolent civil resistance . . . [i]t's over 300 right now, and [I] suspect it will grow a little more still")); Trial Tr. 75, Dec. 21, 2005 (testimony by Captain Pat Smith discussing preparations for the anticipated civil disobedience).

[5] Although Smith was a Lieutenant when the demonstration took place, the trial transcript reflects that by the time he appeared as a witness at Obuszewski's, Robinson's, Reeve's, Muller's, and Long's trial, he had been promoted to the rank of Captain. Trial Tr. 74, Dec. 21, 2005.

[6] The testifying officers gave varying estimates about the amount of time that lapsed between warnings, which ranged from two to five minutes. Trial Tr. Day 1, 52, 90, 149, 154, Nov. 16, 2005. At the trial of Obuszewski, Robinson, Reeve, Muller, and Long, Captain Smith testified that additional warnings were transmitted over handheld megaphones "to make sure everybody's hearing what's going on." Trial Tr. 101, Dec. 21, 2005. Captain Smith also testified that some of the demonstrators assisted by trying to quiet the other demonstrators so they could hear the warnings and by holding up their fingers so demonstrators could see the count down for the warnings. *Id.* at 99, 102. The government also admitted a

-4-

21, 2005. After the third warning, National Park Service police officers closed the sidewalk and arrested the participants who remained there despite the warnings. Trial Tr. Day 1, 52-53, 63-64, 90-91, 122-23, 154-55, Nov. 16, 2005; Trial Tr. 103-104, Dec. 21, 2005. Some of the participants who were sitting on the sidewalk, including Sheehan, refused to stand and had to be carried off the sidewalk by the arresting officers. Trial Tr. Day 1, 122, Nov. 16, 2005; Gov't Trial Ex. 4 (Dec. 21, 2005).

When Sheehan appeared before the court for arraignment on November 16, 2006, she and the other defendants scheduled for trial on that day requested that their cases be consolidated into a single trial before the Magistrate Judge. Trial Tr. Day 1, 6, Nov. 16, 2005. The court declined to consolidate the cases but permitted the defendants' trials to proceed seriatim as one judicial proceeding according to which the parties were permitted to make one opening statement and each arresting officer was called to testify and be examined about the events that took place that day and the facts relating to the defendants he or she arrested.[7] *Id.* at 13-14. After the United States (the "government") rested its case, the defendants called witnesses in support of their collective defense, at the conclusion of which the parties presented closing statements. Trial Tr. Day 2, 53-116, 120-29, Nov. 17, 2005. On November 17, 2005, the presiding Magistrate Judge

---

digital video disc ("DVD") that contained a video recording of the demonstration that documented this activity. Gov't Trial Ex. 4 (Dec. 21, 2005). Because neither the video recording nor Captain Smith's testimony was admitted during Sheehan's trial, however, it was not considered by this Court for the purpose of reviewing her appeal.

[7]     The pro se defendants designated representatives among themselves to make an opening statement, examine witnesses, and make a closing statement. Trial Tr. Day 1, 15-17, Nov. 16, 2005.

found Sheehan guilty of demonstrating without a permit in violation of the National Park Service

regulation. Tr. of Ruling, 12, Nov. 17, 2005. She was ordered to pay a fine of $50.00, as well as

a special processing assessment of $25.00. *Id.* When Obuszewski, Robinson, Reeve, Muller,

and Long appeared for trial on December 21, 2005, they also requested that their trials proceed as

one judicial proceeding conducted in the same manner as Sheehan's trial, which the court

accommodated. Trial Tr. 5,16-20, 22-27, Dec. 21, 2005. After hearing the evidence, the

Magistrate Judge found Obuszewski, Robinson, Reeve, Muller, and Long guilty of demonstrating

without a permit and sentenced them to a total fine of $75.00. *Id.* at 211, 215.

    Sheehan, Obuszewski, Robinson, Reeve, Muller, and Long now appeal their convictions.

## II.

    Pursuant to Rule 58(g)(2)(D) of the Federal Rules of Criminal Procedure ("Fed. R. Crim.

P."), a Magistrate Judge's judgment of conviction entered after a bench trial is reviewed by this

Court according to the same legal standards that govern the appeal of a district court's judgment

to a court of appeals. *United States v. McFarland*, 445 F.3d 29, 30-31 (1st Cir. 2006); *United

States v. Bursey*, 416 F.3d 301, 305 (4th Cir. 2005) ("An appellate review conducted by a district

court after a bench trial before a magistrate judge is not a trial de novo; rather, the district court

utilizes the same standards of review applied by a court of appeals in assessing a district court

conviction."). Consistent with these standards, the Court will affirm a Magistrate Judge's

findings of fact absent clear error, but will review de novo any questions of law, such as the

interpretation of the National Park Service regulation. *See Bursey*, 416 F.3d at 305. The Court

also will review de novo the sufficiency of the evidence, but will consider that evidence – as well

-6-

as any reasonable inferences that properly may be drawn from it – in the light most favorable to the government, with an eye toward determining whether a fair-minded and reasonable trier of fact could find guilt beyond a reasonable doubt. *United States v. Bryant*, 117 F.3d 1464, 1467-68 (D.C. Cir. 1997); *United States v. Young*, 107 F.3d 903, 907 (D.C. Cir. 1997).

### III.

The regulation at issue governs demonstrations in all park areas administered by the National Park Service in the National Capital Region, including the White House sidewalk, and provides that demonstrations involving more than 25 people may be held only pursuant to a permit. 36 C.F.R. § 7.96(g)(2). Demonstrations involving 25 people or fewer may be held without a permit, so long as "the group is not merely an extension of another group already availing itself of the 25-person maximum . . . or will not unreasonably interfere with other demonstrations or special events." *Id.* § 7.96(g)(2)(i). The regulation defines "demonstrations" as follows:

> The term 'demonstrations' includes demonstrations, picketing, speechmaking, marching, holding vigils or religious services and all other like forms of conduct which involve the communication or expression of views or grievances, engaged in by one or more persons, the conduct of which has the effect, intent or propensity to draw a crowd or onlookers. This term does not include casual park use by visitors or tourists which does not have an intent or propensity to attract a crowd of onlookers.

36 C.F.R. § 7.96(g)(1)(i). The applicable penalties provision of the National Park Service regulation states that "[a] person convicted of violating a provision of the regulations contained in Parts 1 through 7 . . . shall be punished by a fine as provided by law, or by imprisonment not exceeding 6 months, or both, and shall be adjudged to pay all costs of the proceedings." 36 C.F.R. § 1.3(a).

-7-

The appellants first argue that their convictions for violating the National Park Service regulation cannot stand because the regulation imposes strict criminal liability for conduct that is protected by the First Amendment to the United States Constitution. Sheehan Br. 6. The appellants assert that the regulation is flawed for failure to require "that a person know that there is no permit before that person may be convicted of violating the regulation" while engaging in constitutionally-protected activities. *Id.* at 7. As a result, the appellants argue, the regulation lacks a mens rea element and is analogous to the permit regulation that was struck down by the United States Court of Appeals for the Sixth Circuit last year in *American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600 (6th Cir. 2005). Accordingly, the appellants seek to have this Court relegate the National Park Service regulation to a similar fate.

The Court is not unsympathetic to the appellants' concern that, absent a requirement that demonstrators know there is no permit, the National Park Service regulation risks inhibiting constitutionally-protected expression by deterring people from participating in demonstrations for fear of arrest.[8] This was the very infirmity that troubled the Sixth Circuit in *Dearborn*. There, the court determined that a city ordinance prohibiting participation in a permitless march was facially unconstitutional because the ordinance imposed strict liability and thereby "place[d] the onus upon every participant to be aware of whether the march has a permit, and would hold any participant liable for its violation, even in cases where the participant was mistakenly advised that a permit was issued." *Dearborn*, 418 F.3d at 612. As a consequence, "the potential

---

[8]     The Court also is not immune to the irony of the particular facts in these cases, the totality of which suggest that the demonstrators actually intended to be arrested, whether for publicity or otherwise.

-8-

protester would be well-advised to seek personal verification from a city official that the

demonstration has been authorized, or run the risk of being thrown in jail." *Id.* According to the

court, "[r]equiring potential march participants to seek authorization from city officials before

joining a public procession or risk being jailed is antithetical to our traditions, and constitutes a

burden on free expression that is more than the First Amendment can bear." *Id.*

 Although this Court agrees in principle with the holding in *Dearborn*, the facts in that

case are distinguishable from the instant case to the extent that the city in *Dearborn* conceded

that the ordinance imposed strict liability and endorsed such a construction as proper to protect

its citizens' health and safety. *Id.* at 610. Consequently, that posture removed any doubt about

whether the ordinance was intended to omit a mens rea requirement and placed the case squarely

in line with *Smith v. California*, 361 U.S. 147 (1959), in which the Supreme Court declared

unconstitutional a Los Angeles city ordinance that imposed strict liability for possessing obscene

or indecent books in a place of business where books were sold.[9] In *Smith*, the Supreme Court

found the Los Angeles ordinance objectionable because it criminalized possession of books

containing obscene material regardless of whether the bookseller knew about the contents of the

books. *Smith*, 361 U.S. at 153. As a result, the Supreme Court reasoned, booksellers might limit

their supply of books to only those they inspected, which would effect "a restriction upon the

distribution of constitutionally protected as well as obscene literature." *Id.* Thus, both *Dearborn*

---

[9] In *Smith*, the state also argued in favor of construing the ordinance to impose strict liability. 361 U.S. at 154 ("It is argued that unless the scienter requirement is dispensed with, regulation of the distribution of obscene material will be ineffective, as booksellers will falsely disclaim knowledge of their books' contents or falsely deny reason to suspect their obscenity.").

and *Smith* stand for the proposition that statutes and regulations may not impose strict liability when doing so inhibits constitutionally-protected expression. *Id.* at 150-51 ("Our decisions furnish examples of legal devices and doctrines in most applications consistent with the Constitution, which cannot be applied in settings where they have the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it.").

Unlike the governments in *Dearborn* and *Smith*, the government in this case opposes interpreting the National Park Service regulation to impose strict liability and argues that the regulation contains a mens rea element, as evidenced by the requirement that a demonstrator "must intend for his or her actions to be of the sort that will attract a crowd or onlookers." Appellee's Br. 7 (citing 36 C.F.R. § 7.96(g)(1)(i)); Appellee's Omnibus Br. 19-24.[10] The government further argues that, even if the regulation is interpreted to lack an express mens rea requirement, the Court should infer such an element to preserve the regulation's constitutionality. Appellee's Br. 8-10; Appellee's Omnibus Br. 19-24.

With regard to the question of whether the National Park Service regulation is a strict liability regulation, the Court notes that the appellants' argument that the regulation must be read to impose strict criminal liability because it lacks an express mens rea requirement runs counter to established precedent, which actually takes the opposite approach by presuming that criminal statutes and regulations contain a mens rea element unless otherwise clearly intimated in the

---

[10]    The Court cites the Brief for Appellee filed by the United States in opposition to Sheehan's appeal as "Appellee's Br. ___" and the Omnibus Opposition Brief for Appellee filed by the United States in opposition to Obuszewski's, Robinson's, Reeve's, Muller's, and Long's appeal as "Appellee's Omnibus Br. ___."

language or legislative history. *Liparota v. United States*, 471 U.S. 419, 425-26 (1985) (concluding that a statute requires a mens rea element "[a]bsent indication of contrary purpose in the language or legislative history"). This interpretive presumption finds its genesis in *Morissette v. United States*, 342 U.S. 246 (1952), in which the Supreme Court declared that "mere omission from [a criminal statute] of any mention of intent will not be construed as eliminating that element from the crimes denounced." 342 U.S. at 263. The Supreme Court subsequently reaffirmed this interpretive presumption in *United States v. United States Gypsum Company*, 438 U.S. 422 (1978), and remarked that "[c]ertainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement." 438 U.S. at 438. It therefore follows that "some indication of [legislative] intent, express or implied, is required to dispense with mens rea as an element of a crime." *Staples v. United States*, 511 U.S. 600, 606 (1994). Indeed, the Supreme Court has suggested that this interpretive presumption is "particularly appropriate" when any other construction of a statute or regulation would result in the criminalization of otherwise innocent conduct. *Liparota*, 471 U.S. at 426. This approach is consonant with the long-standing tenet that strict liability crimes are disfavored in the law. *Id.*

Although the National Park Service regulation contains no express language indicating that demonstrators must know that there is no permit before being subjected to criminal sanctions,[11] there likewise is no language clearly evincing an intent to dispense with such a

---

[11]     The appellants cite *United States v. Taylor*, 937 F.2d 676 (D.C. Cir. 1991), to support their contention that the Court may not infer a mens rea element in this case because the language of the regulation "unambiguously imposes strict liability." Sheehan Reply Br. 13. The appellant overlooks the fact that, in *Taylor*,

mental state, and the appellant proffered no evidence of such an intent by citing to the history of

the regulation, or to any other source for that matter. Thus, following the reasoning applied in

*Morissette* and its progeny, it is clear that "the presumption in favor of a [*mens rea*] requirement

should apply to each of the statutory elements that criminalize otherwise innocent conduct."

*United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994).

In this case, the National Park Service regulation criminalizes demonstrations on the

White House sidewalk involving more than 25 people if there is no permit. 36 C.F.R. §

7.96(g)(2). The failure to secure a permit is "the crucial element separating legal innocence from

wrongful conduct." *X-Citement Video*, 513 U.S. at 73. Accordingly, inferring a requirement that

an individual "knowingly" demonstrate without a permit appears appropriate to remedy any

question about the mental state required to convict someone for violating the National Park

---

the court found that the legislative history of the sentencing guideline at issue
revealed that the guideline originally contained a mens rea element but was later
amended to delete that element. 937 F.2d at 682. Based on the fact that the mens
rea element was deleted from the guideline, the court correctly concluded that the
guideline was intended to impose strict liability. *Id.* ("In light of the recent
amendment deleting the blanket requirement that a sentencing court consider the
defendant's state of mind, we are persuaded that Guidelines section 2K2.1
requires no finding of scienter before the two-level increase for possession of a
stolen gun applies."). To reiterate, however, the appellant proffered no evidence
that the National Park Service regulation was intended to impose strict liability
other than the mere omission of express language identifying a mens rea element,
which precedent dictates generally may not be the sole basis for departing from
the interpretive presumption that criminal statutes and regulations contain a mens
rea requirement. *United States Gypsum Co.*, 438 U.S. at 438. As a result, the
decision in *Taylor* is consistent with the case law as explained above and does not
serve the purpose advanced by the appellant, namely to preclude the Court from
inferring a mens rea element in the National Park Service regulation.

-12-

Service regulation, and such a result is in harmony with the case law.[12] *X-Citement Video, Inc.*, 513 U.S. at 78; *Staples*, 511 U.S. at 614-16; *Liparota*, 471 U.S. at 433-34; *United States Gypsum Co.*, 438 U.S. at 436-38. Requiring knowledge that no permit exists also avoids the chilling effect on constitutionally-protected expression that doomed the ordinances in *Dearborn* and *Smith*. In appropriate circumstances, knowledge might be inferred from circumstantial evidence showing that demonstrators received warnings conveyed in a manner reasonably likely to be heard by them, as occurred in this case. *See Liparota*, 471 U.S. at 434 ("[A]s in any other criminal prosecution requiring mens rea, the Government may prove by reference to facts and circumstances surrounding the case that petitioner knew that his conduct was unauthorized or illegal."). In Sheehan's case, the Magistrate Judge specifically found that "[t]he Defendants' final contention that they did not hear the warnings given by the police and were not told the reason for their arrest is patently not credible."[13] Judgment (Dec. 7, 2005). During the trial involving Obuszewski, Robinson, Reeve, Muller, and Long, the witnesses testifying in support of the collective defense conceded that they had heard the warnings and otherwise offered no evidence showing that any particular defendant had not heard them, albeit one witness could not recall whether he heard them. Trial Tr. 153, 157, 165, 179, 194, Dec. 21, 2005.

---

[12]     Such a construction also comports with the penalties provision applicable to the regulation, which contains three parts, only the first of which is applicable in this case. 36 C.F.R. § 1.3(a). The second part of the provision, however, expressly states that a violation must be committed "knowingly and will-fully." *Id.* at § 1.3(b). There is no reason why the second provision should require such a mens rea element and the first should not.

[13]     This Court defers to the Magistrate Judge's credibility determinations. Fed. R. Civ. P. 52(a) (stating that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses").

Even if the National Park Service regulation did impose strict liability, however, the Court need not tarry over this issue because, after thoroughly reviewing the trial transcript, there is merit to the government's contention that Sheehan, who was represented by counsel, and the other appellants, who were pro se, waived any argument that the regulation lacks a mens rea requirement by failing to raise the issue before or during the trials. Although the defendants at Sheehan's trial repeatedly argued that, as a general proposition, the regulation was unconstitutional because it infringed their First Amendment rights to petition the government, assemble and engage in free speech – and, more specifically, because the regulation was arbitrarily applied – they never challenged the regulation on the ground that it lacked the element of criminal intent. Trial Tr. Day 1, 29-32 (arguing that "there is a First Amendment constitutional right to protest . . . at the White House" and asserting that the regulation was arbitrarily enforced with regard to protests at the White House sidewalk), 36 (asserting that "our rights under the First Amendment supersedes [sic] any of the arbitrary regulations such as the number of persons allowed in front of the White House or the arbitrary manner in which we were arrested and the perimeter that was drawn around us"), 38 ("Well, I'd just like to say that there was no necessity to obtain a permit because we were exercising our rights to freedom of speech."), 41 ("We would submit . . . that not only was it not criminal on First Amendment grounds, that the evidence will come out in this case that it was also protected speech, protected conduct, because of the necessity of getting this message to the President in an effort to try to stop the war and save further life and prevent further loss of life."), 66-67 (sustaining the government's objection to defendants' cross-examination questions about whether the testifying

-14-

National Park Service officer was "familiar with the First Amendment" or "aware that 500 people can gather in Franklin Park without a permit"), Nov. 16, 2005; Trial Tr. Day 2, 31-32 (cross-examining a witness about whether a permit would be required to engage in conduct protected by the First Amendment); Trial Tr. Day 2, 49 (arguing that acquittal was warranted on the grounds that the defendants were exercising their "constitutional right to both free speech, [and the right to] peaceably assemble and petition the Government for redress"), 63 (proffering basis for examining witness about the issue of selective prosecution), 109 (stating that "I didn't think I needed a permit to petition my Government"), 116-19 (raising in support of a renewed motion for acquittal several legal positions that did not include a claim that the regulation lacked a mens rea requirement), 124-29 (presenting closing arguments in support of the defendants' assertions that they were engaged in constitutionally-protected activity, their actions were coerced by necessity, and the regulation was arbitrarily applied), Nov. 17, 2005.    Indeed, Sheehan's contention that she and the other defendants at her trial challenged the constitutionality of the regulation on the ground that it imposed strict criminal liability is belied by the fact that both the defense and the prosecution questioned those defendants who took the stand about their intent. *Id.* at 77 ("And what was your intent in remaining in front of the fence?"), 81-82 (inquiring whether a defendant intentionally remained on the sidewalk and securing her admission that she was expressing her views and did not apply for a permit), 85 (asking a defendant what her intent was when she went to the White House sidewalk), 91 (cross-examining the same defendant about whether she was participating in the demonstration voluntarily, purposely and intentionally), 110 (questioning the appellant about whether she

-15-

intentionally remained on the White House sidewalk despite the risk of arrest and asking other

similar questions from which her intent could be inferred). As a matter of fact, during the direct

examination of a defense witness, the defendant conducting the examination explicitly addressed

the question of criminal intent with the court, but proffered to elicit testimony that the Magistrate

Judge properly ruled was irrelevant because it did not address the applicable elements of the

charged crime; instead, the anticipated testimony served only to show that the witness intended

"to be a living petition" and did not intend "to interfere with anybody else" by, for example,

blocking tourists from the sidewalk. Trial Tr. Day 2, 61-62. At no time, however, did the

defense ever indicate that it was challenging the regulation as entirely lacking a mens rea

requirement. Nor did the defense seek a ruling on the matter from the Magistrate Judge.

Furthermore, the government expressly stated during closing arguments that it must prove that

"there was no permit and that the Defendants *willingly or voluntarily* demonstrated with more

than 25 people," thereby again drawing attention to the issue of intent. *Id.* at 122 (emphasis

added). The appellant did not object to the government's statement of its burden, argue that a

different intent was required, or argue that the statute lacked a mens rea requirement altogether.[14]

---

[14]    The appellant claims that "the Government recognized the plain absence of any
mens rea requirement in the regulations, stating repeatedly that 'notice about the
existence of the permit or lack of a permit is not an element and not a defense of
this violation.'" Sheehan Br. 8 (quoting Trial Tr. Day 2, 121-22,130, Nov. 17,
2005). The defendants raised the issue about "notice," however, in the context of
arguing that the National Park Service should have notified the defendants that a
permit was "rescinded." *Id.* at 46 ("And so I think the important thing is these
people who are charged, Ms. Sheehan and the others, cannot be deemed to have
known that a permit which, in fact, was enacted had later been rescinded.'").
Although the point certainly goes to the question of whether the defendants knew
that they were demonstrating without a permit, the manner in which the issue was
raised cannot reasonably be deemed to have alerted either the court or the

Obuszewski, Robinson, Reeve, Muller, and Long also neglected to raise the issue of strict liability at their trial. During preliminary arguments addressing the defense of necessity, the defendants confirmed that they would be permitted to introduce evidence that their arrests violated the First Amendment. Trial Tr. 42-43, 45, Dec. 21, 2005 ("We will be vigorously arguing that people have a right to petition the government."). The defendants gave no indication, however, that they intended to challenge the constitutionality of the National Park Service regulation on the ground that it imposed strict liability. *Id.* To the contrary, after the Magistrate Judge granted the government's motion in limine to exclude evidence of the necessity defense, one of the defendants inquired whether the court had said that ruling "would preclude any discussion of any intent on behalf of the witnesses," to which the court responded, "I said no such thing," thereby leaving open the possibility that the defendants could present evidence of their intent. *Id.* at 48. That would have been a prime opportunity to raise the argument that the regulation lacks a mental element, but the defendants never did so. *Id.* The defendants also had the opportunity to raise the argument during their motion for acquittal at the conclusion of the government's case and at the conclusion of the defense's case, which they also failed to do. *Id.* at 148-49, 196-97.

"It is the general rule, of course, that a [reviewing] court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). As the Supreme Court has explained:

> For our procedural scheme contemplates that parties shall come to issue in the trial

---

government that the defendants were challenging the constitutionality of the regulation for imposing strict liability.

> forum vested with authority to determine questions of fact. This is essential in order
> that parties may have the opportunity to offer all the evidence they believe relevant
> to the issues which the trial tribunal is alone competent to decide; it is equally
> essential in order that litigants may not be surprised on appeal by final decision there
> of issues upon which they have had no opportunity to introduce evidence.

*Hormel v. Helvering*, 312 U.S. 552, 556 (1941). "This means that, except in exceptional

circumstances, even legal theories not asserted below will not be considered on appeal."

*Director, Office of Workers' Compensation Programs, U.S. Dep't of Labor v. Edward Minte Co.*,

803 F.2d 731, 736 (D.C. Cir. 1986); *see also United States v. Baucum*, 66 F.3d 362, 362-63

(D.C. Cir. 1995) (declining to entertain a defendant's argument that a statute prohibiting cocaine

distribution within 1,000 feet of a school violated the Commerce Clause). The rule applies

whether the matter at issue is of constitutional import or not. *See Yakus v. United States*, 321

U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a

constitutional right may be forfeited in criminal as well as civil cases by the failure to make

timely assertion of the right before a tribunal having jurisdiction to determine it."). Because the

appellants did not argue below that the National Park Service regulation impermissibly imposes

strict liability for protected First Amendment activities, and the appellants advanced no basis for

the Court to hold that "exceptional circumstances" exist that warrant considering the matter for

the first time on appeal, this Court need not pass judgment on the issue.

## IV.

The appellants next argue that the evidence was insufficient to convict them because there

were no facts showing that they were "demonstrating" as defined by the National Park Service

regulation. Sheehan Br. 11-21. As far as Obuszewski, Robinson, Reeve, Muller, and Long are

-18-

concerned, they conceded the fact that they were demonstrating, so they cannot be heard to

challenge the matter now.[15] Trial Tr. 24 (advisory counsel for the defense stating that "[t]hey're

not denying that they demonstrated"), 139-40 (stipulating that they were part of the group

engaging in the activities shown in the video recording and awaiting their arrest after being

warned to leave the area), 157, 166, 178, 181, 193-94, Dec. 21, 2005. Turning to Sheehan's

argument, she asserts that passively sitting on the sidewalk does not constitute "demonstrating"

because sitting is not like the other forms of conduct identified in the regulation, which include

picketing, speechmaking, marching, and holding vigils or religious services. Sheehan Br. 14;

Sheehan Reply Br. 1–2. The appellants' position is that the government had to prove that they

were doing something in addition to sitting to bring their conduct within the purview of the

regulation, and the government's reliance on evidence about what other demonstrators were

doing was insufficient to meet the required burden of proof. Sheehan Br. 11-21; Sheehan Reply

Br. 4-6.

According to the trial evidence, Sheehan, along with other members of an organization

called Gold Star Families for Peace, marched to the White House gate where they requested a

meeting with the President. Trial Tr. Day 2, 100-101, Nov. 17, 2005. After their request was

declined, the members of Gold Star Families for Peace proceeded to the White House sidewalk,

where they sat down and remained for about an hour before being arrested. *Id.* at 103-104. At

the time, Sheehan was among 200 to 300 people who were gathered on the White House

---

[15]     For the same reason, the Court will not address Obuszewski's, Robinson's,
Reeve's, Muller's, and Long's argument that the government failed to introduce
particularized evidence that they were demonstrating.

sidewalk engaging in activities such as chanting, singing and praying that drew a large crowd of

spectators. Trial Tr. Day 1, 120-21, Nov. 16, 2005; Trial Tr. Day 2, 104, Nov. 17, 2005; Sheehan

Br. 3. Sheehan admitted that she was expressing her opposition to the war in Iraq while sitting

on the sidewalk and was willing to risk arrest to deliver her message. Trial Tr. Day 2, 108-109,

Nov. 17, 2005. Sheehan further testified that "on that day [she] wanted to join in solidarity with

the people present, hundreds of people present and millions of people around the country, to ask

for a redress of my wrongs to the President of the United States." *Id.* at 99. Sheehan conceded

that she knew she risked being arrested because of her actions, chose not to leave the sidewalk

despite that risk, and was eventually carried off the sidewalk by two officers. *Id.* at 110-12.

Sheehan's claim that her act of sitting did not meet the regulatory definition of

"demonstrating" simply cannot pass muster in light of her own admission that she was joined in

solidarity with the other demonstrators and was engaged in expressive conduct to communicate

her opposition to the war in Iraq. *Id.* at 108-109. The fact that she chose the act of sitting as the

means to communicate her views does not render her conduct immune from the regulation's

requirements. *See Clark v. Cmty. for Creative Nonviolence*, 468 U.S. 288, 306 (1984) (noting

that sitting and standing normally are not viewed as expressive conduct but, when considered in

the proper context, such as the sit-ins that historically took place in protest against segregation,

standing or sitting may be "powerfully expressive"); *Spence v. Washington*, 418 U.S. 405, 409-

10 (1974) (indicating that an act may be deemed to be expressive conduct based on the nature,

factual context and environment in which it occurred). The regulation defines "demonstration"

to include "demonstrations, picketing, speechmaking, marching, holding vigils or religious

services *and all other like forms of conduct which involve the communication or expression of views or grievances*." 36 C.F.R. § 7.96(g)(1)(i) (emphasis added).  So long as Sheehan was engaged in a similar form of conduct that involved the communication or expression of views or grievances, and had the effect, intent or propensity to attract a crowd of onlookers, her act met the definition of a "demonstration" for the purpose of enforcing the regulation.  *Id.*

The Court is not persuaded that sitting is a form of expressive conduct sufficiently different from the other acts specified in the definition to place it outside the scope of the regulation.  To be sure, the regulation is self-defining when it states "[t]he term 'demonstrations' includes demonstrations . . . ."  *Id.*  The regulation does not further define the second reference to the term "demonstrations," so the Court will construe that term according to its plain meaning. *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) ("In the absence of . . . a definition, we construe a statutory term in accordance with its ordinary or natural meaning.").  The term "demonstration" is defined to include "a public display of group feelings toward a person or cause." Merriam Webster's Collegiate Dictionary 308 (10th Ed. 1999).  Accordingly, the regulation indicates that it applies to a public display of group feelings toward a cause, in this case opposition to the Iraq war.  Sheehan cannot seriously contest that sitting on the White House sidewalk with hundreds of other people as a means of expressing opposition to the Iraq war does not constitute a public display of group feelings toward a cause.  As a result, Sheehan's act of sitting to express her views against the Iraq war meets the definition of a "demonstration" under the regulation. Sheehan's act of sitting to express her views also is similar in kind to holding a vigil or religious

-21-

service, which may involve the quiet observance of prayers or devotions.[16]  To summarize, considered in context and in the light most favorable to the government, Sheehan's act of sitting was conduct that involved the communication of views or grievances and was sufficiently similar in nature and character to the regulation's other identified forms of conduct to constitute demonstrating under the regulation.  The Court also notes that Sheehan never disputed that her conduct was intended to draw a crowd of onlookers.

The Court therefore concludes that the evidence that Sheehan engaged in the act of sitting to publicly express her opposition to the Iraq war, in solidarity with hundreds of other people who were also expressing their opposition to the war, was sufficient for a fair-minded and reasonable person to find beyond a reasonable doubt that she was demonstrating.[17]

## V.

The appellants' final challenge to their convictions is premised on the notion that a permit was granted to the Iraq Pledge of Resistence to demonstrate at the White House sidewalk. Sheehan Br. 21-25; Sheehan Reply Br. 9-11.  The evidence at trial showed that representatives for the Iraq Pledge of Resistence submitted a permit application that was amended to include the

---

[16]    Like the term "demonstration," the term "vigil" is not defined in the regulation, so the Court will construe that term according to its ordinary meaning, which is generally recognized to be "a watch formerly kept on the night before a religious feast with prayer or other devotions" or "evening or nocturnal devotions or prayers."  Merriam Webster's Collegiate Dictionary 1317 (10th Ed. 1999).

[17]    Because the evidence supporting the Court's conclusion consisted of Sheehan's own testimony about her conduct, as well as testimony by the arresting officer who was a percipient witness to her conduct, the evidence was sufficiently individualized and specific to dispose of her argument that she cannot be convicted based on generalized evidence that an undifferentiated mass of people were demonstrating.  Sheehan Br. 17-25; Sheehan Reply Br. 5-7.

White House sidewalk as a location for which they were seeking authorization to demonstrate. Gov't Trial Ex. 1 (Nov. 16, 2005); *supra* n.4; Trial Tr. 68-69, Dec. 21, 2005. The Iraq Pledge of Resistance later cancelled that request, however, via an e-mail from Mr. Gordon Clark to National Park Service officials unambiguously stating "we do NOT wish our permit to include the White House sidewalk." Gov't Trial Ex. 1 (Nov. 16, 2005) (e-mail from Clark to "Harasek, Merryman and others" of 9/23/05). The appellant is correct that the National Park Service regulation states that a permit application shall be deemed granted unless denied in writing within 24 hours of receipt and permits the Service to revoke a permit only in writing for the reasons enumerated in the regulation. 36 C.F.R. §§ 7.96(g)(3) & (g)(6). The regulation does not, however, cover situations in which an applicant voluntarily withdraws or cancels their request for a permit, as occurred here. To suggest that a cancelled request also be subject to the revocation procedures is not compelling, or even practical, given that the regulation allows revocation only in specified circumstances that are not applicable or relevant when an applicant voluntarily cancels his or her application.

Because there is no dispute that the Iraq Pledge of Resistence cancelled its request for a permit to demonstrate on the White House sidewalk, and the defense proffered no evidence to prove that a valid permit was issued for that location after the Iraq Pledge of Resistence cancelled its request, the Court is in agreement with the Magistrate Judge that "[s]uggesting that a valid permit existed to demonstrate in the location where [the appellant was] arrested was frivolous." Judgement, Dec. 7, 2005.

## CONCLUSION

The Court concludes that the National Park Service regulation at issue – 36 C.F.R. § 7.96 – does not impose strict liability and may be interpreted to require that an accused "knowingly" demonstrate without a permit. Moreover, even if the regulation were deemed to lack a mens rea element, the appellants waived their right to challenge the constitutionality of the regulation on that ground by failing to raise the argument below. The Court also concludes that the evidence was sufficient for a fair-minded and reasonable trier of fact to find the appellants guilty beyond a reasonable doubt of demonstrating without a permit in violation of 36 C.F.R. § 7.96. Accordingly, the judgments of conviction are hereby affirmed.

December __18TH__, 2006

_Thomas F. Hogan_

Thomas F. Hogan
Chief Judge